# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| TIFFANY V. WASHINGTON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.  4:22-CV-00514 |
| | § | Judge Mazzant |
| RAYTHEON TECHNOLOGIES | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant Raytheon Technologies Corporation's Motion to Dismiss and/or for Summary Judgment (Dkt. #28). Having considered the motions and the relevant pleadings, the Court finds that Defendant's Motion to Dismiss and/or for Summary Judgment (Dkt. #28) should be **DENIED**.

## BACKGROUND

This case arises out of a series of investigations conducted by Defendant Raytheon Technologies Corporation ("Raytheon") and the United States Air Force ("Air Force") into the Air Force's cybersecurity posture surrounding certain classified programs. Plaintiff Tiffany V. Washington, Raytheon's former employee, alleges that Raytheon discriminated against her based on her race by misrepresenting to the Air Force for which programs she was managerially responsible, ultimately leading to the revocation of her access to these classified programs. Following her report of race discrimination, Plaintiff alleges that Raytheon unlawfully retaliated against her, resulting in her forced resignation.

Raytheon is a contractor that provides cybersecurity services for the Air Force and other government agencies (*see generally* Dkt. #28-1).[1] In 2010, Plaintiff (an African-American woman) began working for Raytheon as an Information System Security Officer ("ISSO") (Dkt. #28-1 at pp. 2–3). As an ISSO, her job was to ensure cybersecurity compliance for classified government systems (Dkt. #28-1 at p. 3). Plaintiff obtained a top-secret security clearance during her employment with Raytheon (Dkt. #28-1 at p. 3).

In 2019, Plaintiff was transferred to one of Raytheon's job facilities in McKinney, Texas, where she began working as an Information System Security Manager (ISSM) (Dkt. #28-1 at p. 11; Dkt. #28-2 at p. 2). As an ISSM, she was again responsible for the cybersecurity compliance of various classified government systems, including programs for the Air Force, Defense Advanced Research Projects Agency, Navy, and Army (*see* Dkt. #28-1 at pp. 8–12). Most of these programs involved Special Access Programs ("SAP"), which were special projects containing classified information (Dkt. #28-1 at p. 13). Plaintiff was the designated ISSM for approximately thirty-five government programs (Dkt. #28-1 at pp. 13, 18). Thirty-four of them were SAPs (Dkt. #28-1 at pp. 13, 18). These included the DNET (DET-8[2]) and IS-42 programs, which both belonged to the Air Force (Dkt. #28-1 at pp. 16–17, 18; Dkt. #32-1 at pp. 3, 8–9, 16; Dkt. #33-2 at pp. 11, 19). On October 13, 2020, Plaintiff was appointed the ISSM for the IS-42 program (Dkt. #28-2 at pp. 2–3).

In early 2021, the Air Force conducted an onsite inspection of its systems to verify that proper cyber hygiene standards were being maintained (Dkt. #28-1 at pp. 25–26; Dkt. #32-1 at pp. 5–6). Employees from both the Air Force and Raytheon, including Plaintiff, participated in the

---

[1] The Court notes that Raytheon indicates it has been misidentified as "Raytheon Technologies Corporation" (Dkt. #28 at p. 7 n. 1), stating its proper name is "Raytheon Company" (Dkt. #28 at p. 7).

[2] DET-8 refers to the Air Force's local detachment for the North Texas region (Dkt. #28-1 at pp. 14–15).

inspection (Dkt. #28-1 at pp. 25–26; Dkt. #32-1 at pp. 5–6). The inspection resulted in unfavorable findings (Dkt. #28-1 at p. 26; Dkt. #32-1 at p. 6).

Plaintiff testified that after the inspection, in February of 2021, Raytheon had implemented organizational changes that made her no longer responsible for the IS-42 program (Dkt. #28-1 at pp. 21, 26–28, 30). According to Plaintiff, Raytheon's restructuring had shifted her down from the ISSM position into an ISSO capacity (Dkt. #28-1 at pp. 19–21, 28, 30, 44–45). Her ISSM appointment letter for the IS-42 program, however, was never rescinded in writing (Dkt. #28-1 at pp. 19–21). Plaintiff testified in a deposition that Raytheon had instructed her not to notify the Air Force of these changes, including that she was no longer responsible for the IS-42 program (Dkt. #28-1 at pp. 19–21, 28, 30).

After the purported reorganization, Plaintiff alleges that Raytheon, over the course of several months, misrepresented to the Air Force that she still managed those programs, in an effort to "intentionally have her charged with security infractions and violations" (Dkt. #18 at p. 5). In May 2021, Raytheon initiated an investigation into the loss of audit logs for the DNET (DET-8) program (Dkt. #32-1 at p. 8). Despite Raytheon's apparent initial determination that Plaintiff was not culpable, Plaintiff received a security violation for the incident (Dkt. #32-1 at pp. 8–13, 15). According to John Meehan[3], the Raytheon employee who conducted the initial inquiry, Air Force representative Jack Baker[4] ordered him on June 7, 2021, to "issue security violations to Plaintiff and Mike Jackson, another Raytheon ISSM, as a result of lost audit logs and mismanagement" (Dkt. #28-3 at p. 2). Tom Palmer, a Special Agent in Charge with the Air Force Office of Special

---

[3] John Meehan is employed by Raytheon as a Contract Program Security Officer (Dkt. #28-3 at p. 2).
[4] Jack Baker was the Air Force Office of Special Investigations' ("AFOSI") program security officer assigned to DET-8 (Dkt. #28-1 at pp. 14–15).

Investigations, testified that Raytheon specifically stated in its report that Plaintiff was found culpable (Dkt. #33-2 at p. 5).

Plaintiff also received security violations resulting from a separate investigation relating to the IS-42 program (Dkt. #32-1 at p. 17–18; Dkt. #32-5 at p. 3). Some hard drives in the IS-42 program had been disconnected from the network, which resulted in them not being audited (Dkt. #32-1 at p. 17–18). Raytheon conducted an initial investigation into the matter, which did not find Plaintiff or anyone else culpable (Dkt. #32-1 at p. 17–18; Dkt. #32-2 at p. 7). The Air Force then conducted its own investigation and determined culpability on the part of Plaintiff (Dkt. #32-2 at p. 7; Dkt. #32-5 at p. 3). According to Jack Baker, Raytheon could have disputed the Air Force's findings because the government recommends security violations but does not issue them (Dkt. #32-5 at p. 3). However, Raytheon allegedly concurred with the findings and then submitted security violations in July of 2021 (Dkt. #32-2 at p. 7; Dkt. #32-4 at pp. 4–5; Dkt. #32-5 at p. 3; Dkt. #33-2 at pp. 6–7).

Based on the totality of the two incidents, Tom Palmer recommended the suspension of Plaintiff's SAP access (Dkt. #33-2 at p. 7). The Air Force then suspended Plaintiff's SAP access through a memorandum dated July 29, 2021, which Plaintiff received on August 10, 2021 (Dkt. #28-3 at p. 3; Dkt. #28-5 at p. 2).

Sometime after August 10, 2021, Plaintiff reported an allegation of race discrimination to Raytheon[5] (*see* Dkt. #28-1 at pp. 68–69; Dkt. #28-3 at p. 3). Plaintiff had not reported an allegation of race discrimination to Raytheon prior to August 10, 2021 (Dkt. #28-1 at pp. 68–69).  Plaintiff

---

[5] The record is unclear as to exactly when Plaintiff reported an allegation of race discrimination to Raytheon.

alleges that individuals outside of her protected class, who were actually responsible for the security violations, were not issued SAP suspensions (Dkt. #18 at p. 7).

Plaintiff continued working for Raytheon until November 15, 2021, when she took a medical leave of absence (Dkt. #28-1 at pp. 58–59). During the period in which she still worked, Plaintiff was only permitted to work on tasks involving unclassified information (*see* Dkt. #28-1 at p. 57). She testified that, despite never receiving a suspension for non-Air Force SAPs, she performed the kind of work that Raytheon would give a seasonal intern (Dkt. #28-1 at p. 57). Plaintiff never returned from her leave of absence and submitted her resignation on May 16, 2022 (Dkt. #28-1 at pp. 61–62). She testified that, prior to resigning, Raytheon had offered her a "demotion" to a Department of Defense collateral job position (Dkt. #28-1 at pp. 65–66).

 On February 24, 2022, Plaintiff filed a charge with the Texas Workforce Commission Civil Rights Division and U.S. Equal Employment Opportunity Commission against Raytheon, alleging race discrimination and retaliation claims in violation of Title VII of the Civil Rights Act of 1964 (Dkt. #32-9 at p. 4).

On June 21, 2022, Plaintiff filed the instant lawsuit against Raytheon (Dkt. #1). On November 21, 2022, Plaintiff filed her First Amended Complaint (Dkt. #18), the live pleading, asserting claims for race discrimination, reprisal, and workplace harassment in violation of Title VII, and a claim for race discrimination under 42 U.S.C. § 1981. On April 27, 2023, Raytheon filed its Motion to Dismiss and/or for Summary Judgment (Dkt. #28). On June 19, 2023, Plaintiff filed her Response (Dkt. #32). On June 26, 2023, Raytheon filed its Reply (Dkt. #33).

## LEGAL STANDARD

### I.  Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Further, parties may raise objections to subject-matter jurisdiction at any time. *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Courts analyze a Rule 12(h)(3) motion to dismiss under the same standards governing a Rule 12(b)(1) motion. *Shenzhen Tange Li'an E-Commerce Co., Ltd. v. Drone Whirl LLC*, 2021 WL 3474007 at \*2 (W.D. Tex. August 6, 2021).

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d

548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

## II.    Summary Judgment

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the Court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Raytheon moves to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(h)(3) for lack of subject matter jurisdiction, arguing such claims are barred from judicial review because they implicate the merits of the Executive Branch's decision to deny Plaintiff access to

8

classified information (Dkt. #28). Alternatively, Raytheon moves for summary judgment, arguing that it is entitled to judgment as a matter of law because (1) AFOSI directed Raytheon to issue the security violations; (2) AFOSI suspended Plaintiff's SAP access; and (3) there is no evidence Raytheon took any adverse action against Plaintiff based on her race or any protected activity (Dkt. #28).

## I.      The *Egan* Jurisdictional Bar

Raytheon argues that, under *Department of the Navy v. Egan*, 484 U.S. 518 (1988), the Court lacks subject matter jurisdiction to evaluate the legitimacy of the Air Force's decision to issue security violations and suspend Plaintiff's access to classified information. In response, Plaintiff contends *Egan* does not apply to the facts of this case for several reasons.

In *Egan*, the respondent, Thomas Egan, lost his job working at a naval facility after he was denied a required security clearance. *Egan*, 484 U.S. at 520. The Supreme Court held the Merit Systems Protection Board did not have authority to review the Navy's decision to deny the respondent's security clearance. *Id.* at 526–530. The Supreme Court determined that the presumption in favor of appellate review "runs aground when it encounters concerns of national security, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Id.* at 527. The Supreme Court further reasoned that "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Id.* at 529.

The Fifth Circuit later extended *Egan*'s holding to judicial review in the context of Title VII. *See Perez v. FBI*, 71 F.3d 513 (5th Cir. 1995) (affirming the district court lacked subject matter

jurisdiction over Title VII claim "[b]ecause the court would have to examine the legitimacy and the possibly pretextual nature of the FBI's proffered reasons for revoking the employee's security clearance . . ."). In *Toy v. Holder*, however, the Fifth Circuit declined to extend *Egan* beyond security clearances. 714 F.3d 881, 885 (5th Cir. 2013). In *Toy*, the plaintiff sued under Title VII, alleging that the FBI had unlawfully revoked her access to physical office buildings. *Id.* at 882, 885. In deciding that *Egan* did not bar the plaintiff's lawsuit, the Fifth Circuit distinguished security clearances from building access. *Id.* at 885. It reasoned that "security-clearance decisions are made by specialized groups of persons, charged with guarding access to secured information, who must make repeated decisions. There is also significant process involved in granting security clearances, the kind of process that allows agencies to make the deliberate, predictive judgments in which they specialize." *Id.* In contrast, the Fifth Circuit explained that building access could be revoked by "someone who does not specialize in making security decisions." *Id.*

Plaintiff first argues that *Egan* does not apply to this case because she was employed by a private company and not the federal government. Although *Egan* and its Fifth Circuit progeny cited above involved government employees, the Court is unconvinced that this distinction prevents an analysis under *Egan*. The linchpin of *Egan* and its cited progeny is the Executive Branch's discretionary duty to safeguard classified information, rather than some government-employer nexus. *See Egan*, 484 U.S. 518; *see Perez*, 71 F.3d 513; *see Toy*, 714 F.3d 881. Indeed, other courts have applied *Egan* to cases involving a private company. *See United States ex rel. Johnson v. Raytheon Co.*, 563 F. Supp. 3d 599, 605, 614 (N.D. Tex. Sep. 21, 2021) (holding *Egan* barred a plaintiff's termination-based claim even though he worked for Raytheon Company, a defense contractor with the Navy); *see Beattie v. Boeing Co.*, 43 F.3d 559 (10th Cir. 1994) ("[T]he case

before us involves a private party rather than a government agency. However, [the defendant's] limited authority to grant or deny escorted access clearance derived solely from its contract with the Air Force . . . [The defendant's] authority was thus delegated to it by the Air Force, and hence by the Executive Branch. We see no compelling reason to treat the security clearance decision by [the defendant] differently than the similar decision made by the Air Force. Both decisions represent the exercise of authority delegated by the Executive Branch and are entitled to appropriate deference by the federal courts.").

Plaintiff next contends that *Egan* does not apply here because her security clearance was not revoked. The Court disagrees. Even though the Air Force only suspended Plaintiff's SAP access and did not revoke her security clearance, this case is distinguishable from *Toy*. Unlike the building access decision in *Toy*, the decision to suspend Plaintiff's SAP access was made by Air Force personnel who specialize in making security decisions. According to the SAP suspension memorandum, the suspension was issued due to multiple security violations causing vulnerabilities to Air Force assets (Dkt. #28-5 at p. 2). Moreover, the suspension appears to have been precursory to an ultimate security-clearance determination made by the Department of Defense (*see* Dkt. #28-5 at p. 2 ¶ 2). Accordingly, the suspension itself falls squarely into the category of decisions controlled by *Egan*. *See Raytheon Co.*, 563 F. Supp. 3d at 612 ("[E]ven assuming that [the plaintiff's] security clearance was not revoked, this case is distinguishable from *Toy* . . . The decision to revoke [the plaintiff's] access to the Program, and the classified information to which he had access as a part of that program, more closely resemble the category of decisions to which *Egan* applies.").

Plaintiff further suggests that she is not challenging the decision to suspend her SAP access or investigation by the Air Force. Instead, Plaintiff asserts she is challenging "whether Raytheon's actions, including Raytheon's failure to notify the Air Force that Plaintiff no longer managed the security programs underlying the suspension, were discriminatory and retaliatory" (Dkt. #32 at p. 13). This is the crux of the matter. Whether *Egan* applies to the facts of this case depends on whether the Court could review Raytheon's employment actions without implicating an underlying security determination. *See Raytheon Co.*, 563 F. Supp. 3d at 612 ("The court agrees with [the plaintiff] that a court could review a contractor's employment decisions if that review did not implicate the underlying security determination.") (citing *Zeinali v. Raytheon Co.*, 636 F.3d 544, 551–52 (9th Cir. 2011).

It is undisputed that the Air Force's decision to suspend Plaintiff's SAP access occurred *after* Raytheon issued the respective security violations against Plaintiff. Evidentiary disputes, however, remain as to whether Raytheon misrepresented Plaintiff's managerial responsibilities *before* such security determination occurred. Some evidence suggests that Raytheon was not obligated to submit security violations as ordered but could have instead relied on its own conclusions. In other words, Raytheon allegedly had the discretion to exonerate Plaintiff, according to her version of events, when confronted with the Air Force's purportedly erroneous findings. Moreover, Raytheon's proffered reason of being ordered by the Air Force to issue the security violations does not necessarily implicate the merits of the Air Force's findings themselves. *See Zeinali*, 636 F.3d at 549–51. Therefore, this Court finds that it could review Raytheon's challenged employment decisions in a pretextual analysis without necessarily implicating the merits of the subsequent suspension decision. *See Zeinali*, 636 F.3d at 549–51.

12

The Court reaches a similar conclusion with respect to Plaintiff's retaliation claim. Applying the reasoning in *Zeinali*, the Court concludes that it has jurisdiction to consider questions relevant to the retaliation claim analysis that do not involve the merits of the Air Force SAP suspension itself. *See id.* For example, the Court can consider whether Plaintiff's Air Force SAP access was suspended and whether her Air Force SAP access was a requirement for her position. *See id.* at 549. After all, "if the plaintiff sues a defendant for allegedly discriminatory conduct that is merely connected to the government's security clearance decision, the concerns of *Egan* are not necessarily implicated." *Id.* at 550. This rings especially true for claims of retaliation against an entity that was not responsible for making the ultimate security determination. Deciding whether Plaintiff's report of race discrimination motivated Raytheon's alleged retaliatory actions does not require questioning the motivation behind the Air Force SAP suspension itself.  *See id.* at 550 ("federal courts have jurisdiction to decide claims that 'do not necessarily require consideration of the merits of a security clearance decision,' as long as they remain vigilant not to 'question the motivation behind the decision to deny [the plaintiff's] security clearance.'" (quoting *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008)).

For these reasons, the Court finds that *Egan* does not bar Plaintiff's suit. Therefore, Raytheon's motion to dismiss for lack of subject matter jurisdiction should be denied.

## II.    Summary Judgment

Raytheon also moves for summary judgment, asking the Court to grant summary judgment in its favor on Plaintiff's claims for race discrimination and retaliation. After a careful review of the record and arguments presented, the Court is not convinced that Raytheon has met its burden of demonstrating that there is no material issue of fact as to any claim that it would be entitled to

judgment as a matter of law. Accordingly, the Court finds that Raytheon's motion for summary judgment should be denied.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Dismiss and/or for Summary Judgment (Dkt. #28) is hereby **DENIED**.

**IT IS SO ORDERED**.

**SIGNED this 15th day of December, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE